**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-cv-24000-BECERRA/TORRES**

ROTHFOS CORPORATION,
a New York Corporation,

        Plaintiff,

v.

H&H COFFEE INVESTMENTS, LLC,
a Florida Limited Liability Company,
H&H COFFEE GROUP EXPORT CORP.,
a Florida Corporation, CACHITA
LATINA RADIO CORP., a Florida
Corporation, CACHITA UNIVERSAL
STUDIOS INC., a Florida Corporation,
ENTV USA CR PUBLISHING CORP., a
Florida Corporation, and ENTV USA
INC., a Florida Corporation,

        Defendants.

**PLAINTIFF'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's Amended Order Setting Trial, Calendar Call, Pretrial Deadlines, and Pretrial Procedures [ECF No. 180], Plaintiff Rothfos Corporation ("Rothfos" or "Plaintiff") submits its Proposed Findings of Fact and Conclusions of Law:[1]

**PROPOSED FINDINGS OF FACT**

**A.**     **The Parties and CLR Roasters, LLC**

1.     Rothfos is company that is involved in importing "green coffee" and selling it to roasters in the U.S. and Canada, who, in turn, resell the coffee to retailers and consumers. Joint

---

[1]   Plaintiff reserves the right to supplement its Proposed Findings of Fact and Conclusions of Law, including based on the evidence presented at trial.

Pretrial Stipulation (hereinafter, "Stip.") [ECF No. 193], at ¶ 13.

2.      Defendant H&H Coffee Investments, LLC ("H&H") is a Florida limited liability company that owns a warehouse located at 7355 N.W. 41st Street, Miami, Florida 33166 (the "Mortgaged Real Property"). Stip. ¶ 15.

3.      Defendants H&H Coffee Group Export Corp., Cachita Latina Radio Corp., Cachita Universal Studios Inc., ENTV USA CR Publishing Corp., and ENTV USA Inc. (collectively, the "Defendant Tenants") operate businesses out of the Mortgaged Real Property pursuant to a purported lease dated July 21, 2021 with H&H as landlord. Stip. ¶ 16.

4.      Alain Piedra Hernandez, a Florida resident, is the sole member of H&H and is the President of each of the Defendant Tenants. Stip. ¶ 18.

5.      Non-party CLR Roasters, LLC ("CLR") was a company involved in roasting and distributing coffee. Stip. ¶ 19.

6.      Rothfos began purchasing coffee from CLR in or about 2010. Stip. ¶ 14.

7.      CLR was Rothfos' sole source of Nicaraguan coffee. Stip. ¶ 20. Non-party Hernandez Hernandez Export & CIA Ltd., a Nicaraguan company ("Hernandez Export"), served as CLR's agent, and was charged by CLR with the duty of procuring coffee for delivery to Rothfos. Stip. ¶ 23.

8.      Alain Piedra Hernandez is a stockholder of Hernandez Export. Stip. ¶ 24.

**B.      The Purchase Orders and Wire Transfers**

9.      Between February 2019 and December 2021, Rothfos and CLR entered into the 49 purchase orders that are the subject of this lawsuit (the "Purchase Orders"), by which CLR agreed to deliver to Rothfos 147,950 bags of green coffee. Stip. ¶¶ 26-28.

10.     H&H was not a party to the Purchase Orders. Stip. ¶ 29.

11.     Seven (7) of the Purchase Orders initially required delivery to be made prior to the 2021-2022 coffee season. Stip. ¶ 31.

12.     After CLR failed to timely deliver the coffee owed under those seven (7) Purchase Orders, Rothfos and CLR agreed to "roll over" the unfulfilled obligation to the 2021-2022 coffee season. Stip. ¶¶ 37, 39.

13.     The remaining 42 Purchase Orders called for delivery during the 2021-2022 coffee season. Stip. ¶ 32.

14.     Rothfos advanced funds to CLR under the Purchase Orders because CLR "need[ed] the money up front to buy the coffee and then ship it to [Rothfos]." Stip. ¶ 34.

15.     From September 10, 2021 to March 17, 2022, Rothfos made nineteen (19) cash advances to CLR in the total amount of $21,700,000 for the purchase of green coffee beans. Stip. ¶ 35; Pl's Trial Ex. 13.

16.     When CLR delivered coffee to Rothfos, Rothfos deducted the value of any delivered coffee from the advanced funds in maintaining records of CLR's account balance. Stip. ¶ 43.

**C.     The Workout Agreement and CLR's Deal Point Memo**

17.     On or about January 7, 2022, Rothfos and CLR executed a document titled "2020/2021 and 2021/2022 Coffee Program Assessment and Acknowledgement," which is also known as the "Workout Agreement." Stip. ¶ 36; Pl's Trial Ex. 9, at p.1.

18.     In the Workout Agreement, Rothfos and CLR agreed to "roll over" unfulfilled coffee orders to the 2021-2022 coffee season. Stip. ¶ 37; Pl's Trial Ex. 9 ¶ 1. The Workout Agreement stated that "the remaining roll over balance" of those contracts was "approximately $6,113,975." Stip. ¶ 38; Pl's Trial Ex. 9 ¶ 1.

19.     The Workout Agreement further stated that "[a]s of today, for crop year 2021-22, Rothfos Corporation has transferred $19,725,000 vs. the equivalent of 233 containers of SHG coffee …." Stip. ¶ 40; Pl's Trial Ex. 9 ¶ 2.

20.     The Workout Agreement set forth a schedule by which coffee was to be delivered from CLR to Rothfos. Pl's Trial Ex. 9 ¶ 2.

21.     Following the parties' execution of the Workout Agreement, CLR again substantially failed to meet its obligation to deliver coffee to Rothfos. *See* Stip. ¶ 50; Pl's Trial Ex. 11, at p.1; Pl's Trial Ex. 25; Pl's Trial Ex. 27.

22.     On June 19, 2022, CLR's President, David Briskie, sent Rothfos a "Deal Point Memo," in which he stated that Rothfos had paid CLR: (i) "approx. $6.1 million" for "2019/2020 crop season" contracts that were rolled over to the 2021/2022 crop/season pursuant to the Workout Agreement, and (ii) "approx. $11,975,000" in additional advances for coffee for the 2021/2022 crop season that remained unfulfilled. Stip. ¶ 50; Pl's Trial Ex. 11, at p.1.

23.     The Deal Point Memo further stated that "approx. $18 million" had been paid by Rothfos to CLR for coffee that CLR had not delivered as of the date thereof. Stip. ¶ 51; Pl's Trial Ex. 11, at p.1.

24.     According to the Deal Point Memo, the total amount that Rothfos advanced to CLR that was not delivered was at least $18,088,975 (i.e., $6,113,975 in unfulfilled, rolled over purchase orders + $11,975,000 in unfulfilled advances = $18,088,975). Stip. ¶ 52; Pl's Trial Ex. 11, at p.1.

25.     The evidence adduced shows that CLR delivered no more than $2,151,275 worth of coffee in respect of the Purchase Orders, namely Purchase Order Nos. 38905, 40181, 40866, and 42933. Pl's Trial Ex. 25; Pl's Trial Ex. 27.

26.     H&H has argued that additional coffee was delivered to Rothfos under purchase orders 42923 through 42932 (which are not purchase orders on which Rothfos' claims are based). While this is correct, Rothfos credited CLR with those coffee deliveries and deducted the value of those deliveries from CLR's account balance. Pl's Trial Ex. 25; Pl's Trial Ex. 27.

### D.     The Guaranty and the Mortgage

27.     In the fall of 2021, Rothfos grew concerned about the amount of money it had paid to CLR against unfulfilled green coffee contracts and informed CLR that it was looking for additional security. Stip. ¶ 53.

28.     As of December 23, 2021, Rothfos was unwilling to advance any additional money to CLR without collateral being provided. Stip. ¶ 57.

29.     On December 24, 2021, H&H executed the Corporate Guaranty (hereinafter, the "Guaranty") and the Mortgage in favor of Rothfos. Stip. ¶ 58; Pl's Trial Ex. 1, at p.1; Pl's Trial Ex. 2, at p.13.

30.     Prior to the execution of the Guaranty, between September 10, 2021 and December 10, 2021 (during 2021-2022 coffee season), Rothfos had advanced to CLR $16,185,000.00 in thirteen (13) separate advances. Pl's Tr. Ex. 13; Pl's Tr. Ex. 69.

31.     H&H did not discuss the Guaranty or the Mortgage with Rothfos prior to H&H's execution of those documents. Stip. ¶ 56. Instead, H&H's understanding of the terms and conditions of the Guaranty and the Mortgage came from the language of those documents, and its discussions with CLR. Stip. ¶ 63.

32.     Pursuant to the terms of the Guaranty, H&H "absolutely, unconditionally and irrevocably guarantee[d]" "all present and future obligations, liabilities, covenants and agreements to be observed, performed, or paid by CLR[.]" Stip. ¶ 59; Pl's Trial Ex. 1 ¶ 1. Paragraph 6(g) of

the Guaranty limited H&H's liability to "purchases and advances" made by Rothfos for the "2021-22 season unless extended by agreement of the parties." Stip. ¶ 60; Pl's Trial Ex. 1 ¶ 6(g).

33.     The Guaranty did not contain any limit as to the total dollar value of the coffee subject to the Guaranty. Stip. ¶ 61. Nor did the Guaranty contain any limit as to the total number of bags of coffee subject to the Guaranty. Stip. ¶ 62.

34.     The Mortgage was given as security for H&H's obligations under the Guaranty, and provided Rothfos with a lien on the Mortgage Real Property and appurtenant personal and intangible property. Stip. ¶ 65; Pl's Trial Ex. 2, at p.1.

35.     Paragraph 9 of the Mortgage, titled "Future Advances," provided that the Mortgage "shall secure not only the existing indebtedness evidenced by the Guaranty, but also such future advances as may be made by Mortgagee to CLR . . . ." Stip. ¶ 66; Pl's Trial Ex. 2 ¶ 9.

36.     Paragraph 9 of the Mortgage further provided that H&H "expressly waives and relinquishes any right granted under Section 697.04, Florida Statutes, or otherwise, to limit the amount of indebtedness that may be outstanding at any time during the term of this Mortgage" and that H&H "covenants not to file for records any notice limiting the maximum principal amount that may be secured by the Mortgage and agrees that any such notice, if filed, shall be null and void and of no effect . . . ." Stip. ¶ 68; Pl's Trial Ex. 2 ¶ 9.

37.     Pursuant to Paragraph 8 of the Mortgage, H&H assigned to Rothfos all rights, title, and interests of H&H to all rents, royalties, issues, profits, revenue, income, proceeds, licenses, and other benefits derived from the Mortgaged Real Property. Stip. ¶ 69; Pl's Trial Ex. 2 ¶ 8.

38.     H&H testified that it was not "misled," "cheated," or "[taken] advantage of" in connection with the Guaranty or the Mortgage. Stip. ¶¶ 70-71.

39.     Rothfos publicly recorded the Mortgage in the Miami-Dade County official records

and initially paid $3,500 in documentary stamp taxes in connection therewith, representing a security interest of up to $1 million. Stip. ¶¶ 72-73.

40.     Rothfos later paid an additional $63,190.40 in documentary stamp taxes in connection with the Mortgage, thereby representing an additional $18,054,376 in principal secured by the Mortgage (or a total of $19,054,376 in principal). Stip. ¶ 75.

41.     Following the execution of the Guaranty and the Mortgage, Rothfos made six (6) wire transfers to CLR, which represented $5,515,000 of the total advances of $21,700,000 at issue in this lawsuit. Stip. ¶ 77.

42.     No additional coffee was delivered or tendered to Rothfos by CLR after the July 19, 2022 Deal Point Memo. Stip. ¶ 78.

43.     On September 29, 2022, Rothfos delivered to CLR and H&H a notice of default. Stip. ¶ 79. On November 30, 2022, Rothfos sent a letter to H&H, pursuant to Section 697.07 of the Florida Statutes, demanding turnover of all rents thereafter collected from the Mortgaged Real Property. Stip. ¶ 81.

44.     No additional funds were paid to Rothfos by CLR or H&H following their receipts of the notice of default or demand for turnover of rents letters. Stip. ¶¶ 80, 82.

### PROPOSED CONCLUSIONS OF LAW

#### A.     Jurisdiction and Venue

45.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity exists between the parties and because the amount in controversy, exclusive of interest and costs, exceeds $75,000. Stip. ¶¶ 3-8. Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred, and the property that is the subject of the action is situated, in this judicial district.

### B.    Florida Law Applies to the Parties' Claims

46.    "A court sitting in diversity must apply the substantive law of the forum. Under Florida law, the parties' choice of law embodied in a contract is presumptively valid and will be given effect unless that choice contravenes a strong public policy." *Talisman Cap. Alt. Invs. Fund, Ltd. v. Mouttet*, No. 10-24577-CIV, 2012 WL 13012424, at *3 (S.D. Fla. Feb. 16, 2012). The law is "well established that two or more documents executed by the same parties, at or near the same time, and concerning the same transaction or subject matter are generally construed together as a single contract." *Steadfast Ins. Co. v. Celebration Source, Inc.*, 240 F. Supp. 3d 1295, 1300 (S.D. Fla. 2017), *aff'd*, 730 F. App'x 865 (11th Cir. 2018).

47.    Florida law applies to the Guaranty and the Mortgage. The Mortgage states that it "shall be governed by and construed under and in accordance with the laws of the State of Florida." Pl's Trial Ex. 2 ¶ 43. Although the Guaranty is silent on the choice of law, it was executed at the same time as the Mortgage and by the same parties. Stip. ¶ 58. In addition, the Mortgage was undisputedly "given as security for payment of . . . [the] Guaranty . . . [,]" so both documents are closely intertwined with the same transaction and subject matter. Pl's Trial Ex. 2, at p.2. Thus, Florida law applies to the Guaranty as well as the Mortgage. *See Steadfast Ins. Co.*, 240 F. Supp. 3d at 1300.

### C.    Rothfos' Breach of Guaranty Claim

48.    Rothfos and CLR entered into 49 Purchase Orders, pursuant to which CLR agreed to deliver to Rothfos 147,950 bags of green coffee. Stip. ¶¶ 26, 27, 28. All of the 49 Purchase Order initially required delivery of coffee during the 2021-2022 coffee season, or were amended pursuant to the Workout Agreement to require delivery of coffee during the 2021-2022 coffee season. Stip. ¶¶ 31, 32, 37, 39; Pl's Trial Ex. 9, at p.1. In connection with the Purchase Orders, Rothfos advanced to CLR $21,700,000, but received no more than $2,151,275 worth of coffee.

Stip. ¶ 35; Pl's Trial Ex. 13; Pl's Trial Ex. 25; Pl's Trial Ex. 27. H&H "absolutely, unconditionally and irrevocably guarantee[d]" all CLR's obligations for "purchases and advances" by Rothfos for the "2021-22 season unless extended by agreement of the parties." Stip. ¶¶ 59-60; Pl's Trial Ex. 1 ¶¶ 1, 6(g).

49.     "A breach of guaranty is a straightforward breach of contract claim." *Talisman Cap. Alt. Invs. Fund, Ltd.*, 2012 WL 13012424, at *4 (citation omitted). "To succeed on such a claim, a plaintiff must establish: (1) the existence of the contract; (2) breach of the contract; and (3) damages resulting from such breach." *Id.* (citing *Rollins. Inc., v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006)). All three elements are present here.

50.     *First*, the Guaranty is a valid contract. Under Florida law, the "basic requirements" of a contract are an "offer, acceptance, consideration and sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). On December 24, 2021, H&H agreed to guaranty CLR's obligations to Rothfos for the 2021-2022 crop season. Stip. ¶ 58; Pl's Trial Ex. 1. Rothfos provided consideration for the Guaranty by making additional advances to CLR totaling $5,515,000 after the Guaranty was executed. Stip. ¶ 77. All requirements for a valid contract under Florida law – offer, acceptance, consideration, and sufficient specification of essential terms – are present.

51.     Although H&H has argued that the Guaranty is unenforceable due to supposed ambiguity or a lack of meeting of the minds, the Court disagrees. "The determination as to whether a contract provision is ambiguous is a question of law for the court." *IPS Avon Park Corp. v. Kinder Morgan, Inc.*, No. 8:20-CV-1643-TPB-CPT, 2022 WL 171904, at *3 (M.D. Fla. Jan. 19, 2022), *aff'd*, 2023 WL 3750708 (11th Cir. June 1, 2023). "A contract is unambiguous if it is not susceptible to more than one *reasonable* interpretation." *Id.* (internal quotation marks and citation

9

omitted) (emphasis in original). "A true ambiguity does not exist because a contract can possibly be interpreted in more than one manner." *Id*. (internal quotation marks and citation omitted). "The fact that both sides ascribe different meanings to the language does not mean the language is ambiguous so as to allow the admission of extrinsic evidence." *Kipp v. Kipp*, 844 So. 2d 691, 693–94 (Fla. 4th DCA 2003). "[F]anciful, inconsistent, and absurd interpretations of plain language are always possible." *IPS*, 2022 WL 171904, at *3 (internal quotation marks and citation omitted). "An ambiguity exists only if a genuine inconsistency, uncertainty, or ambiguity in meaning [] remains after the application of the ordinary rules of construction." *Urogynecology Specialist of Fla. LLC v. Sentinel Ins. Co., Ltd.*, 489 F. Supp. 3d 1297, 1302 (M.D. Fla. 2020) (internal quotation marks and citation omitted).

52.     According to H&H, the Guaranty was ambiguous and there was no meeting of the minds because it used the capitalized, bolded term "**Obligations**" without defining it. But "[u]ndefined terms . . . requiring analysis [do] not automatically render[ ] [a contract] ambiguous . . . ." *Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1306 (11th Cir. 2008) (internal quotation marks and citation omitted). The ordinary rules of contract construction can, and here do, give clear meaning to capitalized, but undefined contractual terms. In this case, the word "**Obligations**," which appears in paragraphs 2 through 6 of the Guaranty, refers to the "obligations" described in the first paragraph of the Guaranty, which states that:

> [H&H] absolutely, unconditionally and irrevocably guarantees … all present and future <u>obligations</u>, liabilities, covenants and agreements required to be observed, performed, or paid by **CLR** … whether extended at the address identified in the purchase orders or elsewhere, including but not limited to purchases from **CLR** whether for purchase of coffee or for any monetary funded advance, prepayment, principal together with interest, costs, expenses or fees (collectively,

Pl's Trial Ex. 1 ¶ 1 (emphasis added). In fact, the "obligations" described in the Guaranty's first paragraph are the <u>only</u> "obligations" (lowercase) mentioned in the Guaranty. The context strongly

suggests that the unfinished parenthetical at the end of paragraph 1 should have concluded with the defined term "Obligations." Paragraph 6(g) further clarifies that the "guaranty shall apply to the purchases and advances by [Rothfos] for the 2021-22 season unless extended by agreement of the parties." Pl's Trial Ex. 1 ¶ 6(g). In similar cases, courts have used context and common sense to construe capitalized, but undefined, terms. *See*, *e.g.*, *Wells Fargo Bank, N.A., v. Farkas*, No. A-15-CV-165-AWA, 2017 WL 1611548, at *4 n.5 (W.D. Tex. Apr. 28, 2017) (using "context" in the contract to define "Equity Law," which was capitalized, but undefined in the contract); *Nippon Fire & Marine Ins. Co. v. M/V Tourcoing*, 979 F. Supp. 206, 212–13 (S.D.N.Y. 1997) (applying the "logical meaning" of "Carriage" which was capitalized, but undefined in the contract), *aff'd sub nom. Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing*, 167 F.3d 99 (2d Cir. 1999).

53.     Moreover, the "language in the contract, the subject matter of the contract, and the object and purpose of the contract" support this interpretation. *See Circuitronix, LLC v. Kapoor*, 440 F. Supp. 3d 1345, 1358–59 (S.D. Fla. 2020). This interpretation reads the provisions of the Guaranty "harmoniously in order to give effect to all portions thereof." *See id*. It also "gives a reasonable meaning to all provisions" of the Guaranty, rather than leaving "a part useless or inexplicable." *See PNC Bank, N.A. v. Progressive Emp. Servs. II*, 55 So. 3d 655, 658 (Fla. 4th DCA 2011) (internal quotation marks and citation omitted).

54.     Nor do Paragraphs 1 and 6(g) of the Guaranty conflict, as H&H argues. "[I]t is a general principle of contract interpretation that a specific provision dealing with a particular subject will control over a different provision dealing only generally with that same subject." *Kel Homes, LLC v. Burris*, 933 So. 2d 699, 703 (Fla. 2d DCA 2006). Both paragraphs deal with the same subject, i.e., CLR's obligations to Rothfos. Paragraph 6(g), which is more specific than paragraph 1, limits the scope of the obligations guaranteed.

55.     Furthermore, H&H has not offered a competing interpretation of "**Obligations**," which is fatal to its argument because a "contract is unambiguous if it is not susceptible to more than one *reasonable* interpretation." *IPS*, at 2022 WL 171904, at *3 (internal quotation marks and citation omitted) (emphasis in original); *see also White v. Harmon Glass Serv. of Fla., Inc.*, 316 So. 2d 599, 600–01 (Fla. 4th DCA 1975) (affirming summary judgment because the movant's interpretation of term was "the only reasonable interpretation to be given the contract"). In fact, the record shows that there is no ambiguity at all because H&H actually *agrees* that the Guaranty is limited to CLR's obligations for the "2021-2022 season." H&H Dep. [ECF No. 192-3], at 91:2-4.

56.     H&H argues that the amount of money secured by the Guaranty is ambiguous, but this is a red herring. The Guaranty is unambiguously unlimited, which means that extrinsic evidence is inadmissible on this point. *See*, *e.g.*, *Vocelle & Berg, L.L.P. v. IMG Citrus, Inc.*, 125 So. 3d 843, 844 (Fla. 4th DCA 2013) (reversing lower court for "relying on extrinsic evidence which directly contradicted the terms of the [unambiguous] agreement"); *In re Estate of Barry*, 689 So. 2d 1186, 1187-88 (Fla. 4th DCA 1997) (holding that the "meaning and the intent of the maker are discerned solely from face of the document" when it is unambiguous).

57.     The Guaranty states that H&H "absolutely, unconditionally and irrevocably guarantees … all present and future obligations, liabilities, covenants and agreements required to be observed, performed, or paid by CLR . . ." to Rothfos for the 2021-2022 coffee season. Pl's Trial Ex. 1 ¶ 1 (emphasis added). Indeed, H&H even testified that "there's no limit as to a dollar amount" in the Guaranty, and "no limit in the guaranty about how many bags of coffee" would be subject to the Guaranty. H&H Dep. [ECF No. 192-3], at 93:7-13.

58.     H&H also argues that the fact that Rothfos paid $3,500 in documentary stamp taxes

proves that the Guaranty is capped at $1 million, but this is irrelevant for the same reason: the Guaranty is unambiguously unlimited. Extrinsic evidence of what Rothfos paid in taxes is inadmissible. *See Vocelle*, 125 So. 3d at 844; *In re Estate of Barry*, 689 So. 2d at 1187-88. But even if it was admissible, it would be irrelevant because Rothfos did not know, and could not have known, in June 2022 that the debt to be secured by the Mortgage would eventually ripen and grow to over $18 million by the end of the 2021-2022 coffee season.

59.     Rather than offering a competing interpretation of the Guaranty, H&H claims that the Guaranty is unenforceable because there was no meeting of the minds over an essential contract term, i.e., the scope of the guaranteed obligation. While that may be H&H's desired result, it is inconsistent with Florida law, which "assumes that parties have made an agreement for some lawful, enforceable purpose . . . ." *J.R.D. Mgmt. Corp. v. Dulin*, 883 So. 2d 314, 316-17 (Fla. 4th DCA 2004). "[C]ourts should not apply a strained or unusual meaning so as to render it entirely unenforceable." *Id.* at 317. "[I]n the belief that the parties intended their agreement to be valid, a contract ought not be readily interpreted as ineffective." *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 941 (Fla. 1979).

60.     "Mutual assent [to a contract] does not mean that two minds must agree on one intention; rather, the formation of a contract depends on the parties having said the same thing, not on their having meant the same thing." *Knowling v. Manavoglu*, 73 So. 3d 301, 303 (Fla. 5th DCA 2011). "A subsequent difference as to the construction of the contract does not affect the validity of the contract or indicate the minds of the parties did not meet with respect thereto." *Bowen v. Larry Gross Const., Inc.*, 781 So. 2d 464, 466 (Fla. 5th DCA 2001) (internal quotation marks and citation omitted). Here, the facts show, and the law dictates, that the parties intended the Guaranty to be a binding, enforceable contract for the guaranty of all CLR's obligations for "purchases and

advances" made by Rothfos for the 2021-2022 season.

61.     *Second*, H&H breached the Guaranty by failing to cure CLR's default. "The law in Florida provides that one who undertakes an absolute guarantee of payment by another becomes liable immediately upon default." *Jain v. Buchanan Ingersoll & Rooney PC*, 322 So. 3d 1201, 1204–05 (Fla. 3d DCA 2021). In such case, "the guarantor becomes liable upon non-payment by the principal, and the person in whose favor the guaranty runs has no duty to first pursue the principal before resorting to the guarantors." *Id.* On September 29, 2022, H&H received a letter from Rothfos' counsel informing H&H that CLR had defaulted on its obligations to CLR and demanding payment for amounts owed. Stip. ¶ 79. H&H did not cure CLR's default. Stip. ¶ 80.

62.     *Third*, Rothfos has been damaged as a result of H&H's breach. Under Florida law, "a party claiming economic losses must produce evidence justifying a definite amount[,]" which "may not be founded on jury speculation or guesswork and must rest on some reasonable factual basis." *United Auto. Ins. Co. v. Colon*, 990 So. 2d 1246, 1248 (Fla. 4th DCA 2008). However, despite the requirement for certainty of damages, there are "several modifying doctrines to this rule," including: (i) "[i]f the fact of damage is proved with certainty, the extent or amount may be left to reasonable inference;" (ii) "[m]ere difficulty in ascertaining the amount of damage is not fatal;" and (iii) "[m]athematical precision in fixing the exact amount is not required." *Sharick v. Se. Univ. of Health Sciences, Inc.*, 780 So. 2d 136, 140 (Fla. 3d DCA 2000). Thus, "[u]ncertainty as to the amount of damages or difficulty in proving the exact amount will not prevent recovery where it is clear that substantial damages were suffered and there is a reasonable basis in the evidence for the amount awarded." *Adams v. Dreyfus Interstate Dev. Corp.*, 352 So. 2d 76, 78 (Fla. 4th DCA 1977).

63.     Here, Rothfos has established that it advanced $21,700,000 in connection with the

Purchase Orders, but received no more than $2,151,275 worth of coffee. Stip. ¶ 35; Pl's Trial Ex. 13; Pl's Trial Ex. 25; Pl's Trial Ex. 27. Moreover, in the June 19, 2022 Deal Point Memo, CLR admitted that it was in arrears on its obligation to deliver $18,088,975 in coffee owed for the 2021-2022 coffee season. Stip. ¶ 52; Pl's Trial Ex. 11, at p.1.[2] Rothfos has stipulated that it will not seek in excess of $18,088,975 in principal damages. Rothfos has established its damages in this amount to an appropriate degree of certainty.

### D.   Rothfos' Foreclosure and Assignment of Rents Claims

64.   Rothfos brings claims to foreclose on the Mortgaged Real Property, to foreclose on the associated personal and intangible property collateral, and to enforce the assignment of rents provision in the Mortgage.

65.   To prevail on its foreclosure claims, Rothfos must "prove their agreement, a default by the defendants, that plaintiffs properly accelerated the debt to maturity [where applicable], and the amount due." *Ernest v. Carter*, 368 So. 2d 428, 429 (Fla. 2d DCA 1979). Rothfos has established each element of its foreclosure claims.

66.   *First*, Rothfos has established a valid Mortgage between it and H&H. Stip. ¶ 58; Pl's Trial Ex. 2. Although H&H argues that the Mortgage is invalid and unenforceable because its terms are contrary to Section 697.04 of the Florida Statutes, the Court disagrees because the Mortgage contains a valid and enforceable waiver of Section 697.04. The Mortgage provides that:

> Mortgagor, for itself, its successors, heirs, executors, personal representatives and assigns, and all successors in title to the Mortgaged Property, hereby expressly

---

[2] The Deal Point Memo is not inadmissible hearsay, as H&H argues, because David Briskie, CLR's former President and the author of the Deal Point Memo, certified under penalty of perjury that the Deal Point Memo meets the requirements for admissibility under Rule 803(6) of the Federal Rules of Evidence. *See* Pl's Trial Ex. 46. The Deal Point Memo is a summary of CLR's then-existing obligations to Rothfos. As such, "the record was made at or near the time by . . . someone with knowledge . . ." because it reflects CLR's obligations to Rothfos as of June 19, 2022. *See* Fed. R. Evid. 803(6).

waives and relinquishes any right granted under Section 697.04, Florida Statutes, or otherwise, to limit the amount of indebtedness that may be outstanding at any time during the term of this Mortgage. Mortgagor, for itself, its successors, heirs, executors, personal representatives and assigns, and all successors in title to the Mortgaged Property, further covenants not to file for records any notice limiting the maximum principal amount that may be secured by this Mortgage and agrees that any such notice, if filed, shall be null and void and of no effect, and further agrees that the filing of any such notice shall constitute an event of default hereunder.

Pl's Trial Ex. 2 ¶ 9 (emphasis added).

67.     Under Florida law, "[a] person may waive any legally entitled rights, including rights guaranteed by the Constitution, conferred by statute or secured by contract. . . . If the waiver is clear and unambiguous it shall be given intended force and effect." *Sussman v. Weintraub*, No. 06-20408, 2007 WL 908280, at *2 (S.D. Fla. Mar. 22, 2007) (enforcing waiver of conditions precedent to foreclosure in mortgage) (emphasis added).

68.     Florida's Supreme Court has explicitly recognized that "[p]arties may contract freely around a statute . . . ." *Hernandez v. Crespo*, 211 So. 3d 19, 24 (Fla. 2016). "[A] contractual provision," however, "that contravenes legislative intent in a way that is clearly injurious to the public good violates public policy and is thus unenforceable." *Id.* (quoting *Franks v. Bowers*, 116 So. 3d 1240, 1247 (Fla. 2013)); *see also Johnson, Pope, Bokor, Ruppel & Burns, LLP v. Forier*, 67 So. 3d 315, 318 (Fla. 2d DCA 2011) ("When a contract 'is not prohibited under [a] constitutional or statutory provision, or prior judicial decision, it should not be struck down on the ground that it is contrary to public policy, except it be clearly injurious to the public good or contravene some established interest of society.'") (quoting *Bituminous Cas. Corp. v. Williams*, 154 Fla. 191 (1944)).

69.     Although H&H argues that Section 697.04 cannot be waived, that argument is contrary to the Florida's Supreme Court decision in *Hernandez* and relies on inapposite authority. Indeed, the cases cited by H&H are all distinguishable because the statutes in those cases expressly

or clearly were enacted for the protection of the public, or expressly stated that actions in contravention thereof were void. *See Gables Ins. Recovery, Inc. v. Citizens Prop. Ins. Corp.*, 261 So. 3d 613, 631 (Fla. 3d DCA 2018) (preamble to the statute at issue expressly stated that the "Legislature finds that it is *necessary for the protection of the public* to regulate public insurance adjusters and to prevent the unauthorized practice of law") (emphasis added); *Gale Force Roofing & Restoration, LLC v. Am. Integrity Ins. Co. of Fla.*, 380 So. 3d 1242, 1245 (Fla. 2d DCA 2024) (statute at issue "expressly provide[d] that an assignment that fails to comply with any of the provisions of subsection 627.7152(2) 'is invalid and unenforceable'"); *Am. Cas. Co. v. Coastal Caisson Drill Co.*, 542 So. 2d 957, 958 (Fla. 1989) (statute at issue establishing performance bond requirements for contractors constructing public buildings was "*for the protection of the public* as well as the subcontractors"). Conversely, Section 697.04 does not contain a Legislative proclamation that it was enacted to protect the public or that mortgages that fail to comply with it are void and unenforceable. And no court has ever found a waiver of Section 697.04 to be clearly injurious to the public good. Thus, the parties' right to "freely contract" around Section 697.04 should be upheld. *See Hernandez*, 211 So. 3d at 25.

70.     H&H's argument that Section 697.04 applies to the Guaranty is also incorrect. Section 697.04 "spells out the protection accorded lenders whose security instruments come within its provisions." *Silver Waters Corp. v. Murphy*, 177 So. 2d 897, 900 (Fla. 2d DCA 1965); *see also* Fla. Stat. § 697.04(3) ("Any such mortgage or other instrument shall be prior in dignity to all subsequent encumbrances, including statutory liens, except landlords' liens."). By its plain terms, Section 697.04 applies to "mortgage[s] or other instrument[s] given for the purpose of creating a lien on real property." Fla. Stat. § 697.04(1)(a).

71.     The Guaranty is outside the scope of Section 697.04. The Guaranty is not a

mortgage. "A mortgage is an interest in real property that secures a creditor's right to repayment." *Can Fin., LLC v. Krazmien*, 253 So. 3d 8, 10 (Fla. 4th DCA 2018). Nor can the Guaranty be "deemed and held" to be a mortgage under Florida law because the Guaranty did not "convey[ ] or sell[ ] property … for the purpose or with the intention of securing the payment of money[.]" Fla. Stat. § 697.01(1) (defining "[i]nstruments deemed mortgages"); *see also Dep't of Revenue, State of Fla. v. Sun Bank*, 556 So. 2d 1154, 1155 (Fla. 5th DCA 1990) (document that guaranteed payment of first mortgage bonds does not qualify as a "mortgage" under Section 697.01); *In re 274 Atl. Isles, LLC*, 651 B.R. 319, 328 (Bankr. S.D. Fla. 2023) (deed-in-lieu delivered, in escrow, to secure performance of the obligations in forbearance agreement does not qualify as a "mortgage" under Section 697.01). "A guaranty," by contrast, "is a promise to pay the debt of another on the default of the person primarily liable for payment or performance." *Fort Plantation Invs., LLC v. Ironstone Bank*, 85 So. 3d 1169, 1171 (Fla. 5th DCA 2012). The Guaranty is thus not a mortgage.

72.     Additionally, the Guaranty does not "creat[e] a lien on real property[.]" Fla. Stat. § 697.04(1)(a). H&H's argument incorrectly conflates the Guaranty, which is a debt obligation, *see Fort Plantation Invs., LLC*, 85 So. 3d at 1171, with the Mortgage, which provides security for the Guaranty, *see WM Specialty Mortg., LLC v. Salomon*, 874 So. 2d 680, 682 (Fla. 4th DCA 2004) ("'a mortgage is but an incident to the debt, the payment of which it secures'") (quoting *Johns v. Gillian*, 184 So. 140, 143 (Fla. 1938)). A "lien" is "[a] legal right or interest that a creditor has in another's property, lasting usu[ally] until a debt or duty that it secures is satisfied." Lien, Black's Law Dictionary (12th ed. 2024). A guaranty is not a "lien." *See Fort Plantation Invs., LLC*, 85 So. 3d at 1171. It is a "promise to pay the debt of another on the default of the person primarily liable for payment or performance." *Id*. The Guaranty thus does not create a lien on the Mortgaged Real

Property.

73.    H&H also argues that the Mortgage should be invalidated based because, according

to H&H, Paragraph 9 constitutes an invalid and unenforceable "dragnet clause" under Florida law.

Paragraph 9 of the Mortgage, titled "Future Advances," states:

> Pursuant to the laws of the State of Florida, this Mortgage shall secure not only the
> existing indebtedness evidenced by the Guaranty, but also such future advances as
> may be made by Mortgagee to CLR in accordance with the H&HI Guaranty or this
> Mortgage, whether or not such advances are obligatory or are to be made at the
> option of Mortgagee, as are made within twenty (20) years from the date hereof, to
> the same extent as if such future advances were made on the date of the execution
> of this Mortgage for the payment of taxes, levies, or insurance on the Mortgaged
> Property, together with interest on such disbursements. Nothing contained herein
> shall be deemed an obligation on the part of Mortgagee to make any future
> advances.

Pl's Trial Ex. 2 ¶ 9.

74.    "Dragnet clauses are those which purport to secure all debts, past, present and

future, between the parties to a security agreement." *Uransky v. First Fed. Sav. & Loan Ass'n of

Fort Myers*, 684 F.2d 750, 756 n.5 (11th Cir. 1982). "[D]ragnet clauses are generally [found to be]

enforceable so long as the language of the clause is clear and unambiguous as to the parties' intent

to secure pre-existing debt as well as after acquired debt." *Starlines Int'l Corp. v. Union Planters

Bank, N.A.*, 976 So. 2d 1172, 1176 (Fla. 4th DCA 2008) (citing *Robert C. Roy Agency, Inc. v. Sun

First Nat'l Bank of Palm Beach*, 468 So. 2d 399, 402 (Fla. 4th DCA 1985)); *see also Uransky*, 684

F.2d at 755 (refusing to consider parol evidence as to interpretation of dragnet clause where "the

agreement between the parties is clear on the face of the mortgage and subsequent modification

agreement"). As to "debts incurred prior to the security agreement," a dragnet clause is enforceable

where "th[o]se debts were specifically identified in the security agreement itself." *United Nat'l

Bank v. Tellam*, 644 So. 2d 97, 98 (Fla. 3d DCA 1994). Thus, at least one court has held that a

clause in a mortgage that "limits the lien to indebtedness referenced by the mortgage" "is not truly

a dragnet clause[.]" *Edrisi v. Sarnoff*, 715 So. 2d 1124, 1126 (Fla. 3d DCA 1998).

75.     Here, the Mortgage unambiguously states that "this Mortgage is given as security for payment of [the] Guaranty" and that the Mortgage "shall cease and be null and void" where "the obligation of CLR to fulfill its obligation to deliver all coffee to [Rothfos] ordered and prepaid by [Rothfos] for the 2021-22 season … has been fulfilled and completed[.]" Pl's Trial Ex. 2, at p.2. The Guaranty – which is incorporated into the Mortgage – similarly provides that "[t]his guaranty shall apply to the purchases and advances by [Rothfos] for the 2021-22 season unless extended by agreement of the parties." Pl's Trial Ex. 1¶ 6(g). Thus, the Mortgage's so-called dragnet clause is valid and enforceable because the Mortgage "is clear and unambiguous as to the parties' intent to secure pre-existing debt as well as after acquired debt." *Starlines Int'l Corp.*, 976 So. 2d at 1176. Furthermore, the clause complies with Florida law as to "debts incurred prior to the security agreement" because "th[o]se debts were specifically identified in the security agreement itself." *Tellam*, 644 So. 2d at 98.

76.     H&H is also incorrect that the Guaranty can be invalidated because it contains a purported "dragnet clause." Dragnet clauses are specific to security instruments, and the law surrounding the enforceability of dragnet clauses pertains to whether preexisting or future debts may be secured by those security instruments. *See*, *e.g.*, *Edrisi*, 715 So. 2d at 1126 (a dragnet clause is "a mortgage provision that purports to make the real estate security for other, usually unspecified, debts") (internal quotation marks and citation omitted); *Uransky*, 684 F.2d at 756 n.5 ("Dragnet clauses are those which purport to secure all debts, past, present and future, between the parties to a security agreement."); Mother Hubbard Clause, Black's Law Dictionary (12th ed. 2024) (A "Mother Hubbard Clause," which is "[a]lso termed anaconda clause" or a "dragnet clause" is "[a] clause stating that a mortgage secures all the debts that the mortgagor may at any

time owe to the mortgagee."). H&H is incorrect that a debt obligation that is secured by a separate mortgage may be invalided by virtue of a dragnet clause.

77.     Even if the Court were to find Paragraph 9 of the Mortgage to be an unenforceable dragnet clause (which it's not), that finding would not invalidate the entirety of the Mortgage, as H&H suggests. The Mortgage contains a severability clause, which states that, "[i]f any provision contained in the Mortgage is declared or held to be invalid or unenforceable, such declaration or holding shall be limited to its most narrow application and shall not affect the remaining provisions of this Agreement, all of which shall remain in full force and effect." Pl's Trial Ex. 2 ¶ 37.

78.     "As a general rule, contractual provisions are severable, where the illegal portion of the contract does not go to its essence, and, with the illegal portion eliminated, there remain valid legal obligations." *Fonte v. AT&T Wireless Servs., Inc.*, 903 So. 2d 1019, 1024 (Fla. 4th DCA 2005); *see also Vanacore Constr., Inc. v. Osborn*, 260 So. 3d 527, 531-32 (Fla. 5th DCA 2018) (quoting *Local No. 234 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada v. Henley & Beckwith, Inc. v. Henley & Beckwith, Inc.*, 66 So. 2d 818, 821-22 (Fla. 1953)). "[T]he question of severability is one of legal construction of the agreement itself." *J.R.D. Mgmt. Corp.*, 883 So. 2d at 316–17.

79.     "[T]he fact that the contract itself contains a severability provision demonstrates that the parties intended for the contract to be severable." *Frankenmuth Mut. Ins. Co. v. Escambia Cnty., Fla.*, 289 F.3d 723, 729 (11th Cir. 2002). Moreover, the future advance clause does not go to the "essence" of the Mortgage because, *inter alia*, the Mortgage states that Rothfos was *not* obligated to make any advances in the future at all: "Nothing contained herein shall be deemed an obligation on the part of Mortgagee to make any future advances." Pl's Trial Ex. 2 ¶ 9 (emphasis added).

80.     In addition to future advances, the Mortgage also secures "present [ ] existing unpaid debt." Pl's Trial Ex. 2, at p.2. The preexisting debt and future advances secured by the Mortgage are easily separated and would not require the Court to rewrite the Mortgage. *See Obolensky v. Chatsworth at Wellington Green, LLC*, 240 So. 3d 6, 9–10 (Fla. 4th DCA 2018) (severing "illegal arbitration provisions" because it "would not entail any rewriting of the arbitration agreement"). At the time that the Mortgage was executed, the "present [ ] existing unpaid debt" was $16,185,000; subsequent future advances totaled $5,515,000. Stip. ¶¶ 35, 77; Pl's Trial Ex. 13.

81.     In *J.R.D. Management Corp.*, the court excised a severance pay clause from an employment contract because there was "no evidence of an intent to make the severance pay clause dependent on the validity of the employment clause." 883 So. 2d at 316-17. The same holds true here. There is no evidence that the portion of the Mortgage securing preexisting debt was dependent on future advances, especially since Rothfos was not contractually obligated to advance any money in the future. Furthermore, the parties bargained for the "most narrow application" of any declaration that any portion of the Mortgage was illegal, and they further agreed that such declaration "shall not affect the remaining provisions of this Agreement." Pl's Trial Ex. 2 ¶ 37.

82.     The court's decision in *J.R.D. Management Corp.* was influenced by the "contract principle, known as the rule of validity," which "holds that in the interpretation of contracts judges will presume that the parties intended a binding, valid agreement, at least in some respect, even if not in all that a party may claim." 883 So. 2d at 316. That principle further holds that because the "law assumes that parties have made an agreement for some lawful, enforceable purpose," courts "should not apply a strained or unusual meaning so as to render it entirely unenforceable." *Id*. at 317. The principle applies here, too, and supports severing the future advance clause from the

Mortgage, so that the Mortgage can stand and continue to secure preexisting debts in keeping with the parties' intent.

83.     In sum, even if the Court were to find the future advance clause to be invalid and unenforceable (which it's not), consistent with the intent of the parties, that clause would be severed from the remainder of the Mortgage, and all advances pre-dating the Mortgage, which totaling $16,185,000, would remain secured by the Mortgage.

84.     *Second*, H&H is in default under the Mortgage. The Mortgage was "given as security for payment" of the Guaranty. Pl's Trial Ex. 2, at p.2. Under the heading "Events of Default," the Mortgage states that H&H is in default if, *inter alia*: "any of the agreements, covenants, stipulations and conditions contained in the Guaranty to [Rothfos] by [H&H] and this Mortgage, or either of them, are not duly performed, complied with and abided by . . . ." Pl's Trial Ex. 2 ¶ 23. *Third*, as set forth above, the amount owed by H&H to Rothfos due under the Guaranty and the Mortgage is $18,088,975.

85.     Rothfos, therefore, is entitled to foreclose on H&H's interests in the Mortgaged Real Property and associated collateral pursuant to the Mortgage, which states:

> Upon any default by Mortgagor under this Mortgage, or breach by Mortgagor of any of the agreements, covenants, stipulations or conditions of this Mortgage, whether set forth in the preceding Paragraph or elsewhere in this Mortgage, the aggregate sum(s) set forth in the Guaranty by [H&H] then remaining unpaid, with interest accrued thereon to that time and unpaid, and all monies secured hereby, shall become due and payable forthwith, at the option of Mortgagee, as fully and completely as if all of the said sum of monies were originally stipulated to be paid on such day, anything in the Guaranty or in this Mortgage to the contrary notwithstanding; and thereupon or thereafter, at the option of Mortgagee, without notice or demand, suit at law or in equity may be prosecuted as if all monies secured hereby had matured prior to its institution, and this Mortgage may thereupon be foreclosed . . . .

Pl's Trial Ex. 2 ¶ 24.

86.     Rothfos is also entitled to foreclose on the Defendant Tenants' interests in the

Mortgage Real Property and associated collateral as well, because those interests are junior to H&H's interests. *See*, *e.g.*, Restatement (Third) of Property (Mortgages) § 7.1 (1997) ("It is a fundamental principle of mortgage law that a valid judicial foreclosure of a senior mortgage terminates not only the [property] owner's title and equitable redemption rights, but also all other junior interests whose holders were made parties defendant."); *Redding v. Stockton, Whatley, Davin & Co.*, 488 So. 2d 548, 549 (Fla. 5th DCA 1986) (stating that foreclosure of senior mortgage extinguishes subordinate lease); *PNC Bank, Nat. Ass'n v. J.P. McCormack Const., Inc.*, 6:12-CV-1042-ORL-37, 2014 WL 235479, at *2 (M.D. Fla. Jan. 22, 2014) (entering foreclosure judgment in favor of plaintiff with "superior rights in the property" against tenants in possession).

87.     Rothfos is also entitled to enforce the assignment of rents provision in the Mortgage. Pl's Trial Ex. 2 ¶ 8. Where an assignment of rent is made, "the mortgagee shall hold a lien on the rents, and the lien created by the assignment shall be perfected and effective against third parties upon recordation of the mortgage or separate instrument in the public records of the county in which the real property is located, according to law." Fla. Stat. § 697.07(3). "Unless otherwise agreed to in writing . . . , the lien created by the assignment of rents is enforceable upon the mortgagor's default and written demand for the rents made by the mortgagee to the mortgagor . . . ." Fla. Stat. § 697.07(4). To obtain an assignment of rents, "the plaintiff need only make a bare showing of a pending foreclosure action with an assignment of rents provision." *Branch Banking & Tr. Co. v. Jomar Hudson, LLC*, No. 8:13-CV-1952-T-17EAJ, 2014 WL 957134, at *1 (M.D. Fla. Mar. 10, 2014) (citing *Wane v. U.S. Bank, Nat's Ass'n,* 128 So. 3d 932, 934 (Fla. 2d DCA 2013)).

88.     Here, the Mortgage contain an assignment of rents provision in the Mortgage. Pl's Trial Ex. 2 ¶ 8. The Mortgage was recorded in Miami-Dade County where the Mortgaged Real

Property is located. Stip. ¶ 72. Rothfos made a demand pursuant to the assignment of rents provision, which H&H ignored. Stip. ¶¶ 81-82. Rothfos, therefore, has established the elements of its claim to enforce the Mortgage's assignment of rents provision.

### E.  H&H's Counterclaims and Affirmative Defenses

#### 1.  Section 697.04 of the Florida Statutes and Ambiguity.

89.    H&H asserts two counterclaims and several affirmative defenses, which seek to have the Mortgage invalided for failure to comply with Section 697.04 of the Florida Statutes and to have the Guaranty invalided due to ambiguity or a lack of meeting of the minds. For the reasons set forth above, those counterclaims and affirmative defenses fail.

#### 2.  Arbitration and Failure to State a Claim

90.    Defendants assert that Rothfos' claim that CLR breached the Purchase Orders was subject to arbitration, and that Rothfos was required to establish CLR's liability in arbitration *before* Rothfos could sue H&H to enforce the Guaranty. These arguments were correctly rejected by this Court twice before: once by Magistrate Judge Otazo-Reyes in a Report and Recommendation, and subsequently by Judge Bloom in an Order Overruling H&H's Objections to the Report and Recommendation. *See*, *e.g.*, Report and Recommendation [ECF No. 28], at p.8; Order Overruling Objections [ECF No. 37], at p.6. Those ruling were correct and shall stand.

91.    Defendants' affirmative defense of "Failure to State a Cause of Action" also fails because, as set forth herein, Rothfos has established its entitlement to relief on all of its claims.

#### 3.  Unclean Hands

92.    Defendants argue that Rothfos has "unclean hands" because "H&H only agreed to the Mortgage . . . on the conditions that the Mortgage (i) would never be recorded in the public records, and (ii) would only secure the repayment of the amounts detailed" in the Guaranty. Neither argument finds any support in the facts or the law.

93.    *First*, the Mortgage does not contain a provision stating that it shall not be publicly recorded. Pl's Trial Ex. 2. Moreover, the evidence shows that Rothfos never discussed the Mortgage with H&H prior it its execution, and thus did not tell H&H that the Mortgage would not be recorded. Stip. ¶ 56.

94.    *Second*, Defendants' argument that H&H understood that the Mortgage "would only secure the repayment of the amounts detailed" in the Guaranty fails because the Guaranty indisputably does not contain a cap on liability or limit Rothfos' purchases or advances. Pl's Trial Ex. 1. Indeed, H&H has conceded that "there's no limit in the guaranty about how many bags of coffee would be subject to that Paragraph G" of the Guaranty, and that "there's no limit as to a dollar amount" in the Guaranty. H&H Dep. [ECF No. 192-3], at 93:7-13.

95.    Similarly, the Mortgage does not contain a liability cap or limit. The Mortgage states that it "shall secure not only the existing indebtedness evidenced by the Guaranty, but **also such future advances** as may be made by Mortgagee to CLR . . . ." Pl's Trial Ex. 2 ¶ 9 (emphasis added). H&H's argument that the Mortgage "would only secure the repayment of the amounts detailed" finds no support in either the Guaranty or the Mortgage.

96.    *Third*, an "unclean hands" defense is inapplicable here. "Unclean hands is an equitable defense much like fraud" that applies to "unscrupulous conduct, overreaching, or trickery that would be condemned by honest and reasonable men." *U.S. Bank Nat'l Ass'n as Tr. for C-Bass Mortg. Loan Asset-Backed Certificates, Series 2006-CB8 v. Qadir*, 342 So. 3d 855, 859 (Fla. 1st DCA 2022) (internal quotation marks and citations omitted).

97.    H&H does not think that it was "misled," "[taken] advantage of," or "cheated" in connection with the Mortgage transaction. Stip. ¶¶ 70-71. Rather, any negative outcome is merely "the consequences of business," according to H&H. Stip. ¶ 71. Moreover, Defendants cannot show

that Rothfos engaged in "unscrupulous conduct, overreaching, or trickery that would be condemned by honest and reasonable men" in connection with the transaction. *See U.S. Bank Nat'l Ass'n*, 342 So. 3d at 859. In fact, H&H admitted that it did not discuss the Mortgage or Guaranty with anyone from Rothfos before signing those documents. Stip. ¶ 56.

### 4. Documentary Stamp Tax Deficiency

98. Defendants claim that a foreclosure judgment in this case must be limited to $1 million because Rothfos initially paid only $3,500 in documentary stamp taxes, which equates to the tax due on recording a $1 million mortgage. First, this fact is irrelevant because, at that time, Rothfos could not have known that the debt to be secured by the Mortgage would eventually ripen and grow to over $18 million.

99. In any event, Rothfos has cured that supposed deficiency. Section 201.08(1) of the Florida Statutes requires that "an instrument not be enforceable in any court of this state until the tax due thereon has been paid. However, there is nothing in the statute or the case decisions that deny enforceability merely because the required documentary stamps have been belatedly purchased and affixed." *Klein v. Royale Grp., Ltd.*, 578 So. 2d 394, 395 (Fla. 3d DCA 1991) (holding that it was an error for court to grant involuntary dismissal when plaintiff paid required tax before oral argument on defendant's motion). Courts merely require a plaintiff to "demonstrate, prior to final judgment, that the documentary taxes have been paid." *Atl. Tech Sys., LLC v. Advanced Lifts & Elevators, Inc.*, No. 08-81376-CIV-MARRA, 2009 WL 1211003, at *2 (S.D. Fla. May 4, 2009).

100. On October 19, 2023, Rothfos paid an additional $63,190.40 in documentary stamp taxes in connection with the Mortgage, thereby securing an additional $18,054,376 in principal (or a total of $19,054,376). Stip. ¶ 75. Thus, any deficiency has been cured prior to judgment. *See Klein*, 578 So. 2d at 395; *Atl. Tech Sys., LLC*, 2009 WL 1211003, at *2.

### 5. Election of Remedies

101.    Defendants also contend that Rothfos cannot simultaneously pursue a judgment for damages and foreclosure. This argument fails for two independent reasons. *First*, H&H waived this defense in the Mortgage when it agreed that Rothfos' potential remedies against H&H were cumulative and concurrent:

> The rights and remedies of Mortgagee hereunder shall be cumulative and concurrent and may be pursued separately, successively, or concurrently against Mortgagor, any guarantor, the Mortgaged Property, or any one or more, at the sole discretion of Mortgagee, and may be exercised as often as occasion therefor shall arise, all to the maximum extent permitted by law.

Pl's Trial Ex. 2 ¶ 27.

102.    *Second*, this defense fails because the Court may and will dictate the sequence of Rothfos' remedies in the final judgment. For example, "courts may enter judgments which allow the pursuit of the legal remedies and permit the initiation of the foreclosure sale process only after a plaintiff certifies that the money judgment had not been satisfied." *Bank v. Nichols Creek Dev., L.L.C.*, No. 3:13-CV-26-J-32JBT, 2015 WL 9474611, at *9 (M.D. Fla. Dec. 29, 2015) (rejecting election of remedies defense under Florida law). "Alternatively, courts may order a foreclosure sale first, leaving a mortgagee to pursue a deficiency judgment if necessary." *Id.*

### 6. Set-Off and Accounting

103.    Defendants assert that they are entitled to a set-off and an accounting because Rothfos supposedly "received more coffee than it has alleged in the Second Amended Complaint[,]" and, therefore, "Rothfos must provide an accounting of the amounts CLR owes, if any, and H&H is entitled to a set off for any overage."

104.    *First*, Defendants have no legal basis for a set-off. "The right of setoff … allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." *Citizens Bank of Maryland v. Strumpf*, 516

28

U.S. 16, 18 (1995) (internal quotation marks and citation omitted). In a set-off, "the mutual debts [between the parties] arise from different transactions." *Richmond Manor Apts., Inc. v. Certain Underwriters at Lloyd's London*, No. 09-60796-CIV, 2011 WL 13175618, at *8 (S.D. Fla. Feb. 28, 2011) (citation omitted). Here, the only transaction between Rothfos and H&H is the Mortgage and Guaranty that is the subject of this lawsuit. Stip. ¶ 29. H&H has not proven that Rothfos owes H&H any money, which is a prerequisite for a set-off defense. Because there are no other transactions between the parties, H&H is not entitled to a set-off.

105.     *Second*, Defendants have no legal basis to demand an accounting. Defendants cannot point to any contractual or statutory right to an accounting. Nor is there any basis to allow an equitable accounting. A party moving for an equitable accounting must allege that "a fiduciary relationship or a complex transaction existed, and second, that a remedy at law would be inadequate." *Bedoyan v. Samra*, 352 So. 3d 361, 365 (Fla. 3d DCA 2022). Defendants fail on both prongs. There was no fiduciary relationship between Rothfos and H&H. And this case is not sufficiently complex to mandate an accounting. *See, e.g., Validsa, Inc. v. PDVSA Sers., Inc.* 424 F. App'x 862, 873 (11th Cir. 2011) (multi-million dollar installment contracts for the sale of metric tons of sugar and beef were "not complex," and claim for equitable accounting was correctly dismissed on summary judgment); *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 694 F. Supp. 2d 1275, 1280-81 (S.D. Fla. 2010) (fact that calculation of damages "may require the aggregation of thousands of receivables does not, in this case, make a calculation of damages unduly complex or unnecessarily extensive"); *Technolojoy, LLC v. BHPH Consulting Servs., LLC*, 2021 WL 8566755, at *6-7 (S.D. Fla. May 2021) (contract involving sale of electronic devices was not complex to warrant an equitable accounting; "[t]he jury would simply be charged with determining what Plaintiffs paid and whether Defendants provided goods in consideration for

those payments"). Nor do Defendants lack an adequate remedy at law, as is necessary to obtain an equitable accounting. *See Bedoyan*, 352 So. 3d at 365.

106.     Recognizing the problems with their set-off and accounting defenses, Defendants reframe them as a mere statement of long-standing Florida law requiring a damages award to be "supported by competent, substantial evidence." *Wagner v. Bank of America, N.A.*, 143 So. 3d 447, 448 (Fla. 2d DCA 2014). As set forth above, Rothfos has proven its damages with the appropriate degree of certainty.

### F.    Attorneys' Fees and Costs

107.     The Mortgage provides for the recovery Rothfos' litigation expenses, including reasonable attorney's fees and costs:

> Mortgagor shall pay all and singular the costs, fees, charges and expenses of every kind, including reasonable attorneys' fees through trial and appellate levels, in connection with any suit for the foreclosure of this Mortgage, and in collecting the amount secured hereby . . . .

Pl's Trial Ex. 2 ¶ 20.

108.     Rothfos, by virtue of this foreclosure action, is entitled to an award of its litigation expenses, including attorneys' fees, against H&H. *See Davis v. Nat'l Med. Enters., Inc.*, 253 F.3d 1314, 1321 (11th Cir. 2001) ("When the parties to a contract determine that the prevailing party in any litigation shall be entitled to attorneys' fees, it is the court's duty to enforce the attorneys' fee provision in the parties' contract."). The Court reserve jurisdiction for an award of Rothfos' litigation expenses, including reasonable attorneys' fees, against H&H.

### CONCLUSION

109.     For the reasons stated, the Court finds in favor of Rothfos on its claims for breach of guaranty, foreclosure on the Mortgaged Real Property and other collateral, and enforcement of the assignment of rents provision, and against Defendants on all of their counterclaims and

affirmative defenses. As required by Federal Rules of Civil Procedure 52 and 58, the Court will set forth its judgment in a separate document.

Date: November 22, 2024                                 Respectfully submitted,

                                                        By: /s/ *Jason P. Hernandez*
                                                            JASON P. HERNANDEZ
                                                            Florida Bar No. 18598
                                                            jhernandez@stearnsweaver.com
                                                            JOSE G. SEPULVEDA
                                                            Florida Bar No. 154490
                                                            jsepulveda@stearnsweaver.com
                                                            MATTHEW M. GRAHAM
                                                            Florida Bar No. 86764
                                                            mgraham@stearnsweaver.com
                                                            STEARNS WEAVER MILLER WEISSLER
                                                            ALHADEFF & SITTERSON, P.A.
                                                            Museum Tower, Suite 2200
                                                            150 West Flagler Street
                                                            Miami, Florida 33130
                                                            Telephone: (305) 789-3200
                                                            Facsimile: (305) 789-3395

                                                        *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 22, 2024, I electronically filed the foregoing with the Clerk of the Court using CM/ECF. Copies of the foregoing document will be served on all parties via transmission of Notice of Electronic Filing generated by CM/ECF.

                                                        /s/ *Jason P. Hernandez*
                                                        JASON P. HERNANDEZ

#13240867